STATE, Respondent, *v.* PUGH, Appellant.

[Submitted June 21, 1895. Decided June 26, 1895.]

HOMICIDE—*Evidence—Res gestae.*—On a trial for murder, evidence of statements made by the defendant when captured about a quarter of a mile away from where the shooting took place and immediately after having fired the fatal shot, to the effect that the deceased hit him in the face and then he shot him, and of statements made by the deceased a short time after the shooting, that the defendant applied to him opprobrious epithets and he struck him, was properly excluded, as such statements were the narrations of events that had passed and not part of the *res gestae.* (*Territory* v. *Clayton,* 8 Mont. 1, cited.)

SAME—*Murder in the first degree—Review on appeal.*—Where the court fully and fairly instructed the jury as to the law of the case, and there was ample evidence to sustain the verdict of murder in the first degree, such verdict will not be disturbed on appeal.

SAME—*Impeachment of witness—Identification of evidence taken before coroner.*—On a trial for murder, evidence taken before the coroner and offered by the defendant for the purpose of impeaching the state's witnesses, was properly excluded where such evidence was in no way identified as that taken before the coroner, nor was it presented to the witnesses sought to be impeached to enable them to say whether it was their testimony given before the coroner, nor was it shown that, if admitted, it would have contradicted any witness as to any material matter.

*Appeal from Fifth Judicial District, Jefferson County.*

CONVICTION for murder in the first degree. The defendant was tried before SHOWERS, J. Affirmed.

*J. C. English* and *C. L. Campbell,* for Appellant.

*Henri J. Haskell*, Attorney General, for the state, Respondent.

PEMBERTON, C. J.—On the 14th day of April, 1895, the above named defendant was convicted of the crime of murder in the first degree, in the district court of Jefferson county, and on the 18th day of said month was, by the court sentenced to be hanged. From the judgment this appeal is prosecuted. The facts of the case, as far as it is necessary to treat them, are stated in the opinion.

On the 5th day of October, 1894, the defendant shot and killed C. W. West, in Silver Bow county. The case was thereafter transferred to the county of Jefferson, where it was tried, with the result above stated. The deceased was a railroad conductor, and at the time of the shooting was engaged in running a freight train on the Butte, Anaconda & Pacific Railroad, from Butte to Anaconda. The defendant and others had gotten on said train to ride to Anaconda, without authority, and against the consent of the deceased. The train was stopped, and the men put off. As the train started the defendant and others got on again. The train was again stopped by deceased, and defendant was ejected therefrom by him. Almost immediately after being ejected from the train the defendant fired two shots at the deceased, from a pistol, inflicting upon him two mortal wounds in the back. The defendant, immediately after firing the shots, ran from the place of the tragedy towards the foothills. He was immediately pursued by persons near by, and captured about a quarter of a mile away. To his captors he stated, in effect, that West hit him in the face, and then he shot him. The defendant sought to prove that this statement was made by him, after his capture, to the witnesses. The court held the testimony to be incompetent. The defendant assigns this ruling as error.

We do not think, as claimed by counsel for defendant, that these statements were part of the *res gestae*. They were part of the defendant's narrative of the events of the tragedy that was passed and complete. Nor were they free from the sus-

picion that they were made with the design of having them constitute a part of the plan of defense. (Wharton on Criminal Evidence, § 262; *Territory* v. *Clayton*, 8 Mont. 1.) Even admitting the ruling complained of to have been wrong, still we think the defendant was not prejudiced. One of the witnesses who assisted in defendant's capture testified, without objection, to this statement of the defendant. The evidence went to the jury, and was not stricken out. The objection to this testimony was made when another witness was on the stand, and held to be inadmissible. So that the defendant got the benefit of this testimony, whatever the benefit may have been.

The defendant also assigns as error the action of the court in excluding evidence of a statement made by deceased, a short time after the·shooting, to the effect that defendant applied to him opprobrious epithets, and he struck him. We think this evidence comes within the same rule, and was subject to the same objection, stated above. But in this case one or more witnesses did testify to this statement of the deceased, and the evidence went to the jury, for what it was worth, without objection. Other witnesses were not permitted to testify to the same fact when objection was made. It does not appear from the record just what time had elapsed after the tragedy before the making of either of the above statements by the respective parties sought to be introduced in evidence, but it is clear that they were made after the tragedy was over and complete, and that they were narrations of events that had passed. We think, therefore, it cannot be claimed that such statements constituted any part of the *res gestae.*

The defendant contends that the evidence is not sufficient to sustain the verdict, because, he says, it does not show premeditation or deliberation.

Witness Pinney, who was the front brakeman on the train at the time of the homicide, after testifying to the attempt of the deceased to get the defendant off the car, and after testifying that it was his duty, as such brakeman, to pay strict attention to the deceased, and that he was doing so, in order to repeat whatever signals he might give to the engineer, swears:

"The party that the conductor was putting off got off on this southwest corner of the car, and Conductor West was standing over on the northwest corner of the car, with his hand up in about that position (illustrating); and as he had his hand up, giving the signal, I repeated the signal to the engineer, and before I had time to get my hand down there was a shot fired. I could not see the shot myself, but I could see the smoke and hear the report. As the shot was fired he seemed to wheel to the right, and as he was wheeling and falling the second shot was fired. I saw the smoke, and it came from the south of Conductor West. It seemed to come up over the car. Apparently, it would be about a foot or a foot and a half or two feet from the platform, from behind where West stood,—not exactly right behind, but a kind of sideways, and behind him, too, partly."

Witness Vardell, who was the rear brakeman on the train at the time of the shooting, and who saw the entire transaction between the parties, testifies : "Conductor West gave a signal with his right hand to go ahead, and I saw the shot fired, and Conductor West turn a little bit sidewise, and fall on his hands. I was behind him, and I seen it from behind. Mr. West was facing towards the engine, and I was facing the engine; West had his back to me, and the smoke came from that corner (indicating). I saw him fall, and he was trying to help himself on the corner of the car, and the second shot was fired, and that came from the same direction as the first; and then I seen a man run from where the shot was fired."

Witness Odgers, a miner working near the place of the tragedy, testifies as follows as to the shooting : "The man on the platform was sitting when I saw him first, and Mr. West was going towards him, simply walking. Mr. West did not appear to be doing anything with his hands, at all, but the minute he got close enough to the platform he got down to the platform; and the man that was sitting on the front of the platform slid off the platform, and got onto the ground. Mr. West did not knock him off, nor kick him off, nor did he use any force whatsoever to get him off; and, a moment or two

after,—I could not tell to a few seconds,—I heard the report of a gun, and saw smoke. 1 saw that smoke coming from the south side of the track,—the opposite side to me. It came from the side that the man got off. That man was Clay Pugh, the defendant in court here. And then I saw C. W. West climbing or falling across the car, to the opposite side, and he fell on the ground on the north side of the car. I saw him fall on the ground after the second shot. There was no time to spare between the shots. I could not see the man when he fired the shots. There could not be much of a flash, but I saw the smoke before it spread any. Judging from the smoke, the shots came from the track down between the cars."

The testimony of the engineer and fireman of the train, and other witnesses, is to the same effect, as to what occurred between the parties at the time of the shooting.

The defendant's testimony as to what occurred at the time of the shooting, and the reason why he shot, is as follows : " As I was raising up, I saw the train was stopped, and I jumped off, and I started back. I had taken a step or so back, and he said, 'Damn you ! I will fix you.' I turned around, and he threw his right hand to his hip pocket, and I drew my revolver, and shot twice. I shot because I thought he intended to shoot me." The testimony of defendant is not corroborated by any witness in these particulars. And it will be noticed that the defendant does not claim that he fired the fatal shots in the heat of passion, aroused by blows or other mistreatment inflicted upon him by the deceased. His claim is that he shot twice because he thought deceased intended to shoot him. It is not contended that the court did not fully and fairly instruct the jury as to the law of the case, and that, before they could find the defendant guilty of murder in the first degree, they must believe from the evidence, beyond a reasonable doubt, that the killing was deliberate and premeditated. It was a matter for the jury to determine, under all the evidence, the degree of crime the defendant was guilty of, if any, under the instructions of the court defining the different degrees of homicide. If the defendant formed in his mind

the purpose to kill, any conceivable length of time before the killing, however short, and acted upon that purpose, then such killing was deliberate.    This was an issue for the jury.    We think there was ample evidence to justify the verdict.

The defendant assigns as error the action of the court in excluding from the jury the evidence taken before the coroner. This evidence was offered for the purpose of impeachment of the testimony of a number of the witnesses for the state. The evidence offered was in no way identified as the evidence of the witnesses given before the coroner.    The defendant did not present this evidence to the witnesses sought to be impeached, to enable them to say whether it was their testimony given before the coroner.    No one else testified that the evidence offered was the evidence of the witnesses given by them before the coroner.    There was not even a certificate of the coroner to that effect.    Nor has it been shown that, if the evidence offered had been admitted, it would have contradicted any witness as to any material matter in the case.    We think the evidence was properly excluded.

After a careful consideration of the errors assigned, and of the entire record of the case, we are unable to discover any grounds for disturbing the result of the trial of this cause. The case seems to have been fairly tried upon the evidence and the law, and we are not prepared to say that the proper result has not been reached.

It appearing that the defendant has been granted a respite by the governor until the 1st day of July, 1895, pending the presentation and decision of this appeal, it is therefore ordered that the judgment of the court below be executed on that day, in accordance with the provisions of section 377 of the criminal practice act.    Remittitur forthwith.

*Affirmed.*

DE WITT and HUNT, JJ., concur.